UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>Plaintiff,<br><br>v.<br><br>**PROSPER BEYOND MOORE, PROSPERITY INVESTMENTS & SOLUTIONS, LLC f/k/a PROSPERITY, INVESTMENTS & LENDING, LLC,**<br><br>Defendants. | Civil Action File No.<br><br>**JURY DEMAND** |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows:

## SUMMARY

1. From approximately October 2021 through March 2023, Prosperity Investments & Solutions, LLC ("Prosperity") and its organizer, Prosper E. Beyond Moore ("Moore") raised more than $1.4 million from over 60 individual investors.

2. Defendants touted Prosperity as a large and reputable financial organization that could provide investors with profits of 50% each month through a diverse range of investments.

3. Contrary to these representations, Defendants used money received from investors to make payments to other investors and to pay personal expenses.

4. To induce additional investments and retain investors, Defendants fabricated false account statements that they provided to existing investors showing weekly rates of return exceeding 10% and monthly rates of return exceeding 40%.

5. Defendants knew that the money invested was not being used to generate the returns reflected on the account statements.

6. In fact, Prosperity did not actually invest most of the funds it received from investors.

7. To the extent that Prosperity did use investor funds to make investments, those investments generated losses of more than $67,000.

8. Many of the individuals who invested with Prosperity were members of Moore's church.

9. Other investors learned of Moore's offerings through religious affiliations in the Nigerian-American community.

## **VIOLATIONS**

10. By the conduct described herein, Moore and Prosperity have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and

77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

## JURISDICTION AND VENUE

11. The Commission brings this action pursuant to the authority conferred upon it by Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

12. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

13. In connection with the transactions, acts, practices, and courses of business described in this Complaint, Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce, of the mails, and/or of the means and instruments of transportation or communication in interstate commerce.

14. Venue is proper in this district as all defendants reside, operate, or are located in this district.

# FACTS

### Defendants

15. **Prosper E Beyond Moore**, age 27, is a resident of Loganville, Georgia. During the relevant period, Moore conducted business as Prosperity Investment & Solutions, LLC, which was formerly known as Prosperity, Investments & Lending, LLC. Moore does not hold any professional licenses and has never been associated with any Commission registered broker-dealer or investment adviser.

16. Moore has not received any financial or investment education from any credentialed university or institution, nor does he have any experience working with any company in the financial or investment industry.

17. **Prosperity Investments & Solutions, LLC** is a Georgia corporation with its principal place of business in Winder, Georgia. On October 20, 2021, Moore incorporated Prosperity. Moore is Prosperity's registered agent and organizer. Moore is in charge of all business operations and decisions of Prosperity. Prior to August 26, 2022, Prosperity was operated under the name Prosperity, Investments & Lending, LLC.

**Defendants' Solicitation Efforts**

18. Prosperity was marketed to prospective investors through social media accounts and a website, the content of which was created, controlled, and authorized by Moore.

19. Defendants focused their marketing efforts on individuals, like Moore, who identified as Christian and were of Nigerian descent.

20. Many of Defendants' investors were members of the church that Moore attended or learned of Moore's offerings through religious networks.

21. For example, one investor, a preacher, learned of Prosperity through an online group called "Jesus Online."

22. Defendants capitalized on shared religious beliefs to attract and retain investors.

23. Some investor communications from Defendants contained biblical quotes and assurances that Defendants were "trusting God that everything will be better than it was before."

24. The website soliciting investors described Prosperity as an "exclusive investing and lending platform."

25. The website told potential investors that Prosperity "provides up to 50% profit of your investment MONTHLY," and "provides you with a new source of passive income, giving you more time to do what you love."

26. Prosperity's website allowed investors to create a client account and offered them the opportunity to invest a minimum amount of $5,000 in one of three programs.

27. The "Silver Investment," with a lock-in period of one month, offered investors up to 50% profit to be delivered at the end of each 30-day investment period, and an investment fee of 10% to be deducted from the investor's total profits.

28. The "Gold Investment," with a lock-in period of three months, offered investors up to 50% profit to be delivered at the end of each 30-day investment period, and an investment fee of 7% to be deducted from the investor's total profits.

29. The "Platinum Investment," with a lock-in period of twelve months, offered investors up to 50% profit to be delivered at the end of each 30-day investment period, and an investment fee of 5% to be deducted from the investor's total profits.

30. A "buy it now" button on Prosperity's website provided a link with instructions for investors to send funds.

31. In many instances, Defendants sent a confirmation email with payment instructions to investors who had submitted a website application for the program.

**The Investment Contracts**

32. Once Defendants had received the investor's funds, Defendants issued an "Investment Agreement Contract" to each investor through the website and email.

33. The agreement provided that Prosperity could "use any and all capital/funds/money in whatever/any way [Prosperity] see[s] fit; that includes but are not exclusive to trading/investing into Stocks, ETFs, Options, Futures, Mutual Funds, Real Estate, Businesses, Organizations, Entities, and etc."

34. The agreement also stated that the investor would "not have access to their capital/funds/money" during the selected investment period.

35. Pursuant to the agreement, Prosperity would "provide … weekly investment profit growth updates that correspond to the Investment Programs and/or Services" provided by Prosperity and the investor could "expect delivery of funds/capital/profits within 5-10 business days after the last day of [the investor's] pre-established investment/lending period.

36. The agreement also provided that Prosperity would be entitled to a "specified investment fee percentage of profit," which it would deduct from the investor's profits and set forth that Prosperity would "deliver up to 50% (percent) return on the [investor's] investment/capital."

37. Between October 2021 and September 2022, Prosperity collected cash investments exceeding $1.4 million from over 60 individual investors, with most investors selecting the Gold Investment program.

38. Investors' funds were pooled and deposited into accounts controlled by Defendants.

39. Prosperity filed no registration statement with the Commission with respect to any of its securities offerings.

40. Defendants did not know or verify the financial circumstances of the investors to which they sold securities.

41. The information collected from prospective investors included only their names, email and mailing addresses, and desired investment amounts.

42. Defendants took no steps to determine whether any of the investors were accredited investors.

43. Many of the investors to which Defendants sold securities were unaccredited.

**Defendants' Fraudulent Investment Scheme**

   *A.   False Statements to Prospective Investors*

44. In their promotional materials, Defendants created the false impression that Prosperity was a large and reputable financial organization with a diverse portfolio of highly profitable investment activities.

45. For example, videos posted on Prosperity's Instagram and Facebook pages proclaimed that an "elite team of investors" from a "certified U.S. financial institution" would apply their expertise to generate significant profits for investors.

46. Defendants also informed prospective investors that Prosperity held a "diverse range of investments that include[d] but [we]re not exclusive to trading/investing into Stocks, ETFs, Options, Futures, Mutual Funds, Real Estate, Businesses, Organizations, Entities, products, and etc."

47. Despite these representations, Moore was the only person managing the investment funds, and he had no formal training or experience in the securities industry.

48. Defendants transferred some investor funds to brokerage accounts opened in Moore's name and over which he had exclusive trading authority, and traded stocks in those accounts.

49. The trades that Moore executed were largely unsuccessful, resulting in total losses of at least $67,000.

50. Defendants did not make any other investments with investor funds.

51. Defendants held no other assets that could generate returns for investors.

52. In fact, Defendants routed some investor funds to make personal payments on behalf of Moore.

53. To keep the scheme afloat, Defendants took out a loan from an online lender to honor existing investors' redemption requests.

54. Defendants also used new investor funds to pay existing investors.

55. Nevertheless, Defendants continued to solicit funds from new investors by advertising the claim that "Prosperity's elite team of investors will work diligently to invest your capital and bring you back 50% return every month."

### B.  *Fabricated Performance Statements*

56. To maintain the appearance that Defendants were investing in securities and making profits, they generated recurring statements and "congratulations" letters, which they sent to investors, via email and U.S. mail, showing the purported growth of each investor's capital.

57. These statements and letters frequently showed weekly rates of return exceeding 10% and monthly rates of return exceeding 40%.

58. The information in the letters and weekly and monthly reports were false.

59. Apart from the investor's initial capital contribution, the investment growth percentages depicted in those documents were fabricated.

60. Defendants provided these recurring email "updates" to investors touting the profitability of the investments that Prosperity was making even during

time periods when Defendants made no profits and conducted no investment activities.

61. For example, several investors were told that they had earned 45% returns between May 2, 2022, and June 3, 2022.

62. During that time period, Defendants did not initiate any transactions in Moore's brokerage accounts, and the beginning and ending balances in those accounts did not change.

63. Defendants knew that the investors would rely on the fabricated statements to reinvest their alleged profits with Prosperity.

64. Under the terms of the investment contract, investors could take their principal, profits, or both, minus Prosperity's fee, at the end of each investment period.

65. Alternatively, investors could elect to reinvest their profits.

66. Several investors increased their investment or authorized reinvestment after receiving the fabricated performance statements.

### C. False Excuses in Response to Investor Complaints

67. Beginning in mid-2022, Defendants were unable to pay investors whose contract terms had ended and who sought a return of their capital.

68. Nevertheless, Defendants continued to solicit new investors.

69. When soliciting new investors, Defendants did not tell those potential investors that Prosperity was unable to fulfill the terms of existing investment contracts.

70. Defendants also did not tell existing investors of their inability to return capital at the end of the investment contract term.

71. To generate the funding necessary to return investor capital, Defendants obtained a loan of $50,000 from an online lender.

72. Defendants did not disclose the existence of this loan to prospective investors.

73. Prosperity's website and social media accounts continued to represent that investors could expect monthly returns of up to 50%.

74. Defendants also continued to issue fictional performance statements to existing investors without disclosing the loan or Prosperity's failure to generate any revenue.

75. To explain delayed payments to concerned investors, Defendants fabricated a variety of excuses.

76. Defendants told some investors that the delay was due to lengthy closures of financial institutions due to public holidays.

77. Defendants also told investors that the delay was due to their efforts to grow Prosperity into a larger and more profitable investment company.

78. Specifically, Defendants told investors that their need to hire additional personnel and the purported burdens of complying with governing rules and regulations affected Prosperity's ability to honor redemption requests.

79. Defendants sent emails to investors stating that Prosperity was "in the process of hiring more accountants to handle the increased demand of clients and transactions," had "recently added new customer services representatives to [its] team" to field customer calls, and would "follow up with the account managers" to explain changes to its investment plans.

80. In addition, the emails assured investors that the "Accounting and Treasury Departments" and an "Executive Board" were working diligently to deliver profit checks.

81. In fact, Moore was conducting all of Prosperity's business operations, and never hired additional personnel.

### D. Targeting of Christian and Nigerian Communities

82. The investor pool largely comprised investors who identified as Christian and of Nigerian descent.

83. Many of the Defendants' investors were members of Moore's church or learned of Moore's offerings through religious networks.

84. For example, one investor, a preacher, explained that he and two other investors, also preachers, attended the same high school in Nigeria and learned of Prosperity through an online group called "Jesus Online."

85. Moreover, the Defendants appear to have capitalized on shared religious beliefs to attract and retain investors.

86. Some investor communications from Moore contained biblical quotes and assurances that the Defendants were "trusting God that everything will be better than it was before."

## COUNT I

**Violations of Sections 5(a) and 5(c) of the Securities Act**
**[15 U.S.C. §§ 77e(a) and 77e(c)]**

87. Paragraphs 1 through 86 are hereby realleged and are incorporated herein by reference.

88. Defendants offered and sold securities, including promissory notes.

89. Defendants used interstate transportation, communication or mails in connection with the offer and sale of securities.

90. At the time of the offer and sale of securities, no registration statement was in effect as to the securities offered and sold.

91. By reason of the foregoing, Defendants have violated and, unless enjoined, will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

92. The Commission realleges paragraphs 1 through 86 above.

93. Between October 2021 and March 2023, Defendants in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

94. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

95. While engaging in the course of conduct described above, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

96. By reason of the foregoing, Defendants directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### Violations of Section 17(a)(2) and (a)(3) of the Securities Act
### [15 U.S.C. § 77q(a)(2) and (a)(3)]

97. Paragraphs 1 through 86 are hereby realleged and are incorporated by reference.

98. Between October 2021 and March 2023, Defendants, in the offer and sale of securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

    a. obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    b. engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities, all as more particularly described above.

99. Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT IV

### Violations of Section 10(b) and Rule 10b-5 of the Exchange Act
### [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

100. The Commission realleges paragraphs 1 through 86 above.

101. Between October 2021 and March 2023, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a.    employed devices, schemes, and artifices to defraud;

    b.    made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.    engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

102. Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business. In engaging in such conduct, Defendants acted

with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

103. By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully prays for:

### I.

Permanent injunctions enjoining Defendants and their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

A permanent injunction enjoining Defendant Moore from directly or indirectly participating in the issuance, purchase, offer, or sale of any security, provided that such injunction shall not prevent Moore from purchasing or selling securities listed on a national securities exchange for his own personal account.

### III.

An order, pursuant to Sections 21(d)(5) and (7) of the Exchange Act [15 U.S.C. §§ 78(u)(d)(5), (7)] and this Court's inherent equitable authority, requiring disgorgement by Defendants of all ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

### IV.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] imposing civil penalties against Defendants.

### V.

An order pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and/or Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] prohibiting Defendant Moore from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

### VI.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

## JURY TRIAL DEMAND

The Commission hereby demands a trial by jury as to all issues that may be so tried.

Respectfully submitted this 18th day of January, 2024,

*/s/ Kristin W. Murnahan*
M. Graham Loomis
Regional Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7622
Georgia Bar No. 457868
loomism@sec.gov

Kristin W. Murnahan
Senior Trial Counsel
United States Securities & Exchange Commission
950 E. Paces Ferry Road NE, Suite 900
Atlanta, GA 30326
404-842-7655
Georgia Bar No. 759054
murnahank@sec.gov

COUNSEL FOR PLAINTIFF